IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| BRENDA GADDIS | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| BRANDYWINE SENIOR CARE, INC. | : | |
| d/b/a BRANDYWINE SENIOR LIVING | : | |
| AT HAVERFORD ESTATES | : | NO. 18-2479 |

## MEMORANDUM

Bartle, J.                                    September 10 , 2019

Plaintiff Brenda Gaddis ("Gaddis") brings this action
against her former employer, defendant Brandywine Senior Care of
Haverford, LLC d/b/a Brandywine Senior Living at Haverford
Estates ("Brandywine"), for violations of the Age Discrimination
in Employment Act, 29 U.S.C. §§ 621 et seq., the Americans with
Disabilities Act, 42 U.S.C. §§ 12101 et seq., and the
Pennsylvania Human Relations Act, 43 Pa. Stat. §§ 951 et seq.[1]
Before the court is the motion of Brandywine for summary
judgment under Rule 56 of the Federal Rules of Civil Procedure.

I

Under Rule 56 of the Federal Rules of Civil Procedure,
summary judgment is appropriate "if the movant shows that there
is no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law."  Fed. R. Civ. P.

_____

1.  Defendant was incorrectly denominated as "Brandywine Senior
Care, Inc. d/b/a/ Brandywine Senior Living at Haverford Estates"
in the complaint.

56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323
(1986). A dispute is genuine if the evidence is such that a
reasonable factfinder could return a verdict for the nonmoving
party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254
(1986). We view the facts and draw all inferences in favor of
the nonmoving party. See In re Flat Glass Antitrust Litig.,
385 F.3d 350, 357 (3d Cir. 2004).

        Summary judgment is granted where there is insufficient
record evidence for a reasonable factfinder to find for the
nonmovant. See Anderson, 477 U.S. at 252. "The mere existence of
a scintilla of evidence in support of the [nonmoving party]'s
position will be insufficient; there must be evidence on which the
jury could reasonably find for [that party]." Id. In addition,
Rule 56(e)(2) provides "[i]f a party fails to properly support an
assertion of fact or fails to properly address another party's
assertion of fact as required by Rule 56(c), the court may . . .
consider the fact undisputed for the purposes of the motion."
Fed. R. Civ. P. 56(e)(2).

II

        The following facts are undisputed. Brandywine is an
assisted and independent living facility for senior citizen
residents. It is licensed as a "personal care home" under
Pennsylvania law. See 55 Pa. Code § 2600.1. Brandywine is one
of a group of related facilities that is overseen by a corporate

-2-

parent, Brandywine Senior Living, LLC ("BSL Corporate"). The facility is divided into two units. One, called "Reflections," is designed for residents with memory impairments. All other residents live in the "Assisted Living" unit.

Gaddis is a licensed practical nurse who began working for Brandywine in 2000 as a Wellness Nurse in the facility's Wellness Department, which provides nursing services to residents. Gaddis provided care to residents in both the Assisted Living and Reflections units. Gaddis reported to the Wellness Director, who during the relevant time period was Lisa Adoni ("Adoni"). Adoni in turn reported to the facility's Executive Director, Michael West ("West"), and the Clinical Operations Manager for BSL Corporate, Jo-Anna Reed ("Reed").

Gaddis was diagnosed with diabetes in the 1980s. There is no dispute that her diabetes has at times been uncontrolled and that she has suffered from hypoglycemia.[2] When her blood sugar is too low, Gaddis sometimes sweats, gets hungry, and loses consciousness. She also occasionally suffers from fatigue, nausea, fast heart rate, and blood pressure issues due to her diabetes. Gaddis cannot always predict when she is about to have a hypoglycemic event.

_____

2. As Gaddis explained in her deposition, hypoglycemia is when an individual's blood glucose level drops well below the normal range required to keep the individual alert, oriented, and functioning properly.

-3-

Gaddis maintains a "Medication Administration" policy to ensure the safe storage, handling, and administration of medication. That policy provides in relevant part:

> A. All medication that is administered by the staff of Brandywine Assisted Living Community will be given by a licensed nurse.
>
> . . . .
>
> D. Residents that are unable to self-administer their medication . . . will be given their medication by the [nurse] on duty.
>
> . . . .
>
> F. Nursing Personnel that are administering medication will refer to the resident's [Medication Administration Record ("MAR")] for orders and a resident photo.
>
> G. All personnel will verify the medication orders on the MAR with the orders in the resident record.
>
> H. All personnel will follow the five medication rights.[3]

Brandywine also maintains a "Disciplinary Procedures" policy. That policy provides for progressive discipline with the following steps: (1) informal counseling; (2) verbal warning; (3) written warning; (4) final written warning;

---

3. According to the record before the court, the "five rights" of medication administration are: (1) the right patient; (2) the right drug; (3) the right dose; (4) the right route; and (5) the right time.

(5) suspension pending investigation; and (6) discharge.[4]  Most
discipline should be provided in writing on a "performance
improvement notice" form.  However, "the company retains the
right to bypass progressive discipline steps based on
responsibility at the time, scope and severity of the issue"
and the policy further provides that "[r]epeated violations of
the same rule, violation of more than one rule in a single act,
or violations of different rules at different times are
considered just cause for accelerated or more serious
disciplinary action up to and including termination."
Termination of employment requires the approval of both the
employee's manager and the administrator or executive director.
If the employee has eight years of service or more with the
company, BSL Corporate must also approve any termination before
it may occur.

Under Pennsylvania regulations, the Pennsylvania
Department of Health ("DOH") is required to perform unannounced
inspections of facilities such as Brandywine.  During an
inspection, representations from the DOH will observe nurses
administer medications for potential errors.  The DOH has the
authority to cite and fine Brandywine for each medication error

---

4.   The Brandywine policy specifically refers to "verbal"
warnings, which means "[o]f, relating to, or expressed in
words."   See Black's Law Dictionary (11th ed. 2019).   It is
clear that the word "verbal" in the context of this policy means
"oral."

it observes. As a result, it is critical that Brandywine be prepared for state inspections. In April 2015, the DOH inspected Brandywine and issued several citations for deficiencies regarding medication administration observed during an inspection.

To assist with preparation for state inspections, Brandywine contracts with Innovative Pharmaceutical Packaging Corporation ("IPPC"). IPPC is an independent entity that provides nursing consulting services to clients such as Brandywine, including helping the clients to prepare for state inspections, providing in-service education to clients' nursing staff, and performing regular "Medical Administration Observations" ("MAOs") of the clients' nurses. IPPC performed multiple MAOS of Brandywine per year, with visits lasting approximately two to three hours.

In March 2015, Gaddis had a hypoglycemic incident while at home in which she lost consciousness and was taken to the hospital via ambulance. Gaddis was admitted for two days and discharged on March 12, 2015. She returned to work on March 18, 2015 with a note from her physician clearing her to work without any restrictions.

On April 2, 2015, Gaddis was observed by Reed passing medication to a resident without a MAR, that is, a Medication Administration Record, in hand. The MAR is a piece of paper

-6-

that lists the medications a patient has been prescribed and is used to record when medications are administered. Referring to the MAR while administering medications helps nurses adhere to Brandywine's Medication Administration policy and decreases the likelihood of errors. Gaddis received an oral warning for her failure to have a MAR in hand. She was instructed to follow Brandywine policy and was warned that further infractions would result in progressive disciplinary action up to and including termination. Gaddis does not dispute that she was required to have the MAR with her when administering medication and that she failed to do so on this occasion.

On May 14, 2015, Gaddis received a final written warning after she left medication in a cup with a resident seated at a dining room table with other residents. The final written warning stated that leaving medication unattended was detrimental to the safety and well-being of residents. Gaddis explains that she was distracted by a new nurse she was training and that nurse was the one who left the medication unattended. However, Gaddis does not dispute that she was responsible for the trainee and her actions.

On June 4, 2015, Gaddis suffered a hypoglycemic event at work. Toward the end of her shift around 2:45 p.m., Gaddis began to feel "a little shaky." She went to the breakroom to purchase candy from the vending machine to raise her glucose

-7-

level. Unfortunately, Gaddis lost consciousness as she was about to put money into the machine. Gaddis was observed by other employees with coins in her mouth. West was called to the scene and witnessed Gaddis slurring her speech and speaking incomprehensibly. Paramedics were called to the scene and Gaddis regained consciousness after approximately fifteen minutes. Gaddis declined to be taken to the hospital and was instead picked up by her husband. The next day, Gaddis went to the emergency room. She was cleared by the emergency room physician to return to work but advised to follow up with her primary care physician, an endocrinologist, and an ophthalmologist.

In the meantime, on June 4, 2015, West and Adoni emailed Reed and Deborah Stine, the Chief Nursing Officer of Brandywine, regarding Gaddis. West wrote:

> We have a problem, Brenda was found in the breakroom ready to swallow her coins and was totally incoherent. Her blood sugar was 23, we called 911 and they gave her an IV but she refused to go to the hospital.
>
> Apparently she had an incident at home a couple months ago, similar in fashion only I think she fainted.
>
> I don't feel she is capable of managing the meds for the residents if her blood sugar is not managed properly.
>
> Any suggestions other than we don't allow her to return until she is cleared by the doctor again?

-8-

Thereafter, on June 4, 2015, Stine and Reed instructed West and Adoni to inform Gaddis that she required clearance from her primary care physician, an endocrinologist, an ophthalmologist, and an occupational health provider to return to work. Stine also stated that Brandywine would have to complete ADA paperwork if Gaddis were placed on any restrictions by her physicians. In response, West stated: "[t]his is what I was assuming, because we also have the age issue."

Thereafter, Gaddis submitted the requested clearances. All four health care providers cleared her to return to work with no restrictions. On June 15, 2015, she returned to work.

On June 29, 2015, a nurse from IPPC, Deborah DeMaio ("DeMaio"), visited Brandywine to conduct a MAO.[5] During the visit DeMaio observed the two Wellness Nurses, Gaddis and another nurse named Fatmata Kromah ("Kromah"), who were on duty and administering medications. Gaddis had never before been observed in a MAO during her tenure with Brandywine. DeMaio observed Gaddis administer fifty-two medications to twelve residents. While administering medication, Gaddis committed the following four errors: (1) she twice touched pills with her bare hands, which could contaminate pills and lead to an increased risk of infection for residents; (2) she took a

_____

5. Although the MAO paperwork is dated July 29, 2015, DeMaio states that the month was likely a typographical error.

resident's blood pressure in the facility's dining room, rather

than a more private space such as the resident's room or the

facility's Wellness Department; (3) she administered a drug to a

resident thirty minutes outside of the required time window,

which could negatively impact the safety and efficacy of the

medication; and (4) she failed to keep the MAR with her while

she administered medications to a resident, the same infraction

for which Gaddis had received an oral warning in April 2015.  In

contrast, nurse Kromah administered forty-three medications to

ten patients and committed no errors.

        After reviewing the results of the MAO and Gaddis's

prior disciplinary history, Adoni emailed West, Stine, and Reed

requesting permission to terminate Gaddis because "she poses [a]

potential harm for our residents."  After reviewing the MAO and

the disciplinary history, West made the decision to terminate

Gaddis's employment.  In accordance with Brandywine policy, BSL

Corporate approved the termination.  Gaddis was terminated on

July 2, 2015.

        At the time of her termination, Gaddis was sixty-three

years old.  Following Gaddis's termination, Brandywine increased

the hours of a part-time nurse to full-time to cover Gaddis's

shifts.  That nurse, Ginger Adams-Marshall, was born in 1973 and

is approximately nineteen years younger than Gaddis.

We begin with Gaddis's claims under the ADEA and PHRA for age discrimination in the termination of her employment.[6] Claims for disparate treatment on the basis of age are analyzed under the three-step burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Smith v. City of Allentown, 589 F.3d 684, 689 (3d Cir. 2009). In the first step of this analysis, Gaddis must first come forward with evidence of the following to establish her prima facie case: (1) she is at least forty years old; (2) she suffered an adverse employment decision; (3) she was qualified for the position in question; and (4) she was ultimately replaced by another employee who was sufficiently younger so as to support an inference of discrimination. Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 644 (3d Cir. 2015) (citing Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013)). Brandywine does not dispute that Gaddis has produced sufficient evidence regarding her prima facie case.

Once the plaintiff has successfully established a prima facie case creating an inference of discrimination, the burden of production then shifts to the employer to "articulate

6. Gaddis's claim for discrimination on the basis of age under the PHRA is analyzed identically to her claim under the ADEA. See Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 643 (3d Cir. 2015).

a legitimate nondiscriminatory reason for the adverse employment action." Id. (quoting Jones v. Sch. Dist. of Phila., 198 F.3d 403, 412 (3d Cir. 1999)). If the employer satisfies this second step, the burden of production shifts back to the plaintiff to produce evidence that the employer's proffered reason was pretextual. Id. (citing Burton, 707 F.3d at 426-27). At trial, the ultimate burden of proof remains with the plaintiff at all times. See Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

The first way to show pretext is for the plaintiff to point to evidence that would allow a factfinder to disbelieve the employer's reason for the adverse employment action. Willis, 808 F.3d at 644 (citing Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994)). In order to raise sufficient disbelief, the evidence must indicate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" to suggest that the employer's actions could not have been for nondiscriminatory reasons. Id. at 644-45 (quoting Fuentes, 32 F.3d at 765).

Alternatively, a plaintiff may establish pretext by pointing to evidence that would allow a factfinder to believe that an invidious discriminatory reason was "more likely than not a motivating or determinative cause" of the employer's action. Id. (quoting Fuentes, 32 F.3d at 764). Pointing to

-12-

evidence demonstrating any of the following satisfies this second way to prove pretext: "(1) the defendant previously discriminated against the plaintiff; (2) the defendant discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated, substantially younger individuals more favorably." Id. (citing Simpson v. Kay Jewelers, 142 F.3d 639, 645 (3d Cir. 1998)).

As a legitimate, nondiscriminatory reason for Gaddis's discharge, Brandywine had cited Gaddis's disciplinary record and repeated errors in administering medication to residents. As discussed above, Gaddis received an oral warning in April 2015 for administering medication without a MAR. She then received a final written warning in May 2015 for leaving medication unattended near residents. On June 29, 2015, she was observed by IPPC, an independent auditor, committing four additional medication errors, including again administering medication without a MAR. Gaddis does not dispute that she committed these errors.

As evidence of pretext, Gaddis points to the fact that Brandywine skipped steps in imposing discipline. Specifically, Brandywine issued her an oral warning without first engaging in informal counseling and then bypassed the first written warning step to impose a final written warning. However, under its Disciplinary Procedures policy Brandywine retained the right to

-13-

bypass progressive discipline steps "based on responsibility at the time, scope and severity of the issue." The policy further provided that "[r]epeated violations of the same rule, violation of more than one rule in a single act, or violations of different rules at different times are considered just cause for accelerated or more serious disciplinary action up to and including termination." Here, Gaddis repeatedly violated Brandywine's policy regarding medication administration, including the rule that she administer medication with a MAR in hand. Thus, under the relevant policies Brandywine retained the right to skip steps in its disciplinary procedures and to impose termination.

Gaddis emphasizes that only she and a "pool nurse," that is, nurse Kromah, were observed during the MAO on June 29, 2015. However, Gaddis and Kromah were the only nurses on duty administering medications when IPPC conducted its visit. Although Gaddis had never before been audited during her career, she has produced no evidence to substantiate her insinuation that she was somehow targeted for the audit. Instead, the record shows that IPPC conducted visits to Brandywine several times per year. Gaddis also has not significantly contradicted the findings of IPPC's investigation. While she asserts that a patient could waive privacy and thus consent to having his or her blood pressure taken in a common area such as a dining room,

she has not introduced evidence that the patient did so. She also has not disputed that she did, in fact, commit the other errors cited by IPPC, including twice touching medications with her bare hands and also administering medication without an MAR in hand while aware that she was under observation. In comparison, Kromah committed no errors during the MAO.

Gaddis also asserts that another Brandywine employee outside the protected class, Diedre McDaniel ("McDaniel"), engaged in similar conduct but received more favorable treatment. See Simpson, 142 F.3d at 645. On or about May 1, 2015, McDaniel was overseeing a Brandywine nurse and two other nurses contracted from a staffing agency. Due to a miscommunication, those nurses failed to administer necessary medications to numerous patients in the Reflections unit. Brandywine reported these errors to the Pennsylvania Bureau of Human Services Licensing as well as to the families of those residents. McDaniel received informal counseling as a result of the incident for failing properly to supervise the nurses.

To be considered similarly situated, comparator employees need not be identically situated but must be similarly situated in all relevant respects. Wilcher v. Postmaster Gen., 441 F. App'x 879, 882 (3d Cir. 2011). Factors relevant to the analysis include the employees' job responsibilities, the supervisors and decision-makers involved, and the nature of the

-15-

misconduct alleged. Id. Whether comparators are similarly
situated is generally a question of fact for the jury.
Abdul-Latif v. Cty. of Lancaster, 990 F. Supp. 2d 517, 526
(E.D. Pa. 2014). However, summary judgment is appropriate where
there is no evidence from which a jury could conclude that the
alleged comparators were similarly situated. See Opsatnik v.
Norfolk S. Corp., 335 F. App'x 220, 222-24 (3d Cir. 2009).

        McDaniel is not an appropriate comparator for Gaddis.
McDaniel is the Reflections Coordinator for Brandywine. This is
a supervisory position with different responsibilities than
those of a Wellness Nurse such as Gaddis. At the time of the
incident at issue, McDaniel was a new hire still within her
ninety-day probationary period. Moreover, McDaniel did not
actually commit any medication errors herself but instead was
disciplined for errors committed by nurses under her
supervision. In contrast, Gaddis personally committed numerous
errors in the administration of medications. Gaddis has not
introduced evidence of any other comparator who committed
medication errors and was treated less favorably. Brandywine
has produced the records of at least three nurses who are
younger than Gaddis and who were disciplined for committing
medication errors. Brandywine's treatment of McDaniel does not
constitute evidence of pretext.

Gaddis further asserts that Adoni treated her in an abrasive manner but was more pleasant toward younger employees. However, Gaddis has failed to point to any specific incident of abrasive treatment to support her allegations nor has she provided any details regarding this allegedly differential treatment. This self-serving and vague testimony is insufficient to defeat summary judgment. See Petro-Ryder v. Pittman, No. 15-2908, 2015 WL 8731623, at *10 (E.D. Pa. Dec. 11, 2015).

Finally, Gaddis points to the June 4, 2015 email by West regarding Gaddis in which he stated that "we also have the age issue." West made this comment in an email chain discussing the medical clearances Brandywine would require before Gaddis could return to work after the hypoglycemic event in which she lost consciousness while on duty. The comment was made several weeks before Gaddis was terminated. In his deposition, West explained that he did not intend to discriminate against Gaddis on the basis of age but rather was acknowledging that Brandywine would need to be cognizant of the ADEA in its treatment of Gaddis. However, we must assume for purposes of this motion that West made this comment with discriminatory animus since we must construe all facts in the light most favorable to Gaddis at this stage of the proceedings.

-17-

Brandywine cites Ezold v. Wolf, Block, Schorr &
Solis-Cohen, in which our Court of Appeals concluded that
"[s]tray remarks by non-decisionmakers or by decisionmakers
unrelated to the decision process are rarely given great weight,
particularly if they were made temporally remote from the date
of decision." 983 F.2d 509, 545 (3d Cir. 1992). However, we
find the facts of Ezold distinguishable. In Ezold, a gender
discrimination case, the plaintiff pointed to evidence that a
superior had commented in a meeting that it "would not be easy"
for the plaintiff at the company, in part because she was a
woman. Id. As further evidence of pretext, the plaintiff also
pointed to several other gender-related or sexual comments made
by that superior over the course of plaintiff's five-year
employment with the firm. Id. at 545-47. The first comment was
made before the plaintiff was hired and five years before the
plaintiff was passed over for the promotion at issue. Id. at
545. In addition, the comments were all made by a superior who
had departed the firm and thus was not involved in the decision
not to promote plaintiff. Id. at 545-47.

Here, we have a comment about Gaddis's age made by an
actual decisionmaker shortly before her termination. On the
record before us, we find that this comment is sufficient to
raise a genuine dispute of material fact as to whether the
reason proffered by Brandywine for Gaddis's discharge was

-18-

pretextual and whether Gaddis's age was "a motivating or
determinative cause" for her discharge.  See Fuentes, 32 F.3d at
764.

Accordingly, the motion of Brandywine for summary
judgment will be denied as to Gaddis's claims for discrimination
on the basis of age in violation of the ADEA and the PHRA.

IV

We turn now to Gaddis's claims for disability
discrimination under the ADA and the PHRA.  To establish her
prima facie case of disparate treatment disability
discrimination, Gaddis must produce evidence that:  (1) she is a
disabled person within the meaning of the ADA; (2) she is
otherwise qualified to perform the essential functions of her
job, with or without reasonable accommodations by her employer;
and (3) she has suffered an adverse employment action as a
result of discrimination.  Shaner v. Synthes, 204 F.3d 494, 500
(3d Cir. 2000) (citing Gaul v. Lucent Techs., Inc., 134 F.3d
576, 580 (3d Cir. 1998)).

Gaddis's claim of disability discrimination is subject
to the burden shifting framework of McDonnell Douglas Corp.
described above.  If she succeeds in establishing a prima facie
case, the burden of production then shifts to Brandywine "to
articulate some legitimate, nondiscriminatory reason for the
employee's rejection."  Id. (quoting McDonnell Douglas, 411 U.S.

-19-

at 802). Should Brandywine meet this burden, Gaddis must then point to evidence that the legitimate reasons offered by Brandywine were not its true reasons but were a pretext for discrimination to defeat summary judgment. Id. (citing Jones, 198 F.3d at 410). As stated above, at trial the ultimate burden of proof remains with the plaintiff at all times. Id. at 500-01 (citing Jones, 198 F.3d at 410).

Brandywine does not dispute that Gaddis's diabetes is a disability within the meaning of the ADA, that she was otherwise qualified for her position as Wellness Nurse, and that her termination constituted an adverse action. Gaddis has presented evidence that she notified Brandywine of a hospitalization regarding her diabetes in March 2015 and less than one month later, Gaddis began receiving discipline for alleged medication errors that culminated in her termination at the end of June. Based on this evidence, we will assume for purposes of this motion that Gaddis has produced sufficient evidence of her prima facie case.

However, Brandywine maintains that its motion for summary judgment should be granted because it has established a legitimate, nondiscriminatory reason for the termination: Gaddis's numerous medication administration errors. Gaddis responds that the performance issues cited by Brandywine are pretext for disability discrimination. It is Gaddis's burden to

-20-

"point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve [Brandywine's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [Brandywine's] action." Fuentes, 32 F.3d at 764.

As evidence of pretext, Gaddis asserts that Brandywine conducted an inadequate investigation before imposing discipline and failed to afford her an opportunity to address the audit findings. Evidence that an employer's investigation was inadequate is insufficient to establish pretext. See, e.g., Money v. Provident Mutual Life Ins. Co., 189 F. App'x 114, 116-17 (3d Cir. 2006); Geddis v. Univ. of Delaware, 40 F. App'x 650, 653 (3d Cir. 2002); Bloch v. Mack Trucks, Inc., 240 F. Supp. 3d 365, 375 (E.D. Pa. 2017). Regardless, Gaddis has not disputed that she did in fact commit the errors for which she was disciplined, including at least three of the errors that she was observed committing by the independent auditor on June 29, 2015.[7] It is unclear how further investigation would have changed the outcome of the disciplinary process. Moreover, the record reflects that Gaddis was, in fact, presented with the

_____

7. As noted above, Gaddis disputes whether it was incorrect to perform blood pressure testing on a resident in a common area because she asserts that the resident could waive his or her privacy rights.

-21-

opportunity to provide a written response each time she was
presented with a "Performance Improvement Notification"
memorializing the discipline and that DeMaio, the consultant
from IPPC, discussed the results of the audit with Gaddis at the
time of the observation.

There is also no dispute that Brandywine reserved the
right to skip steps in the disciplinary procedures, up to and
including termination, depending on the circumstances of the
offense. Brandywine has pointed to numerous other nurses
outside the protected class who were disciplined for committing
medication administration errors similar to those committed by
Gaddis. Gaddis may subjectively disagree that her errors were
serious or that they warranted termination but, as discussed
above, this is insufficient to establish that the errors were
merely pretext for disability discrimination because it is the
employer's belief that governs. See Keller v. Orix Credit
Alliance, Inc., 130 F.3d 1101, 1108-11 (3d Cir. 1997); Oliver v.
Clinical Practices of Univ. of Pa., 921 F. Supp. 2d 434, 451
(E.D. Pa. 2013).

In addition, Gaddis references inconsistencies
regarding when the decision to terminate her was made. She
points to evidence that Adoni was contemplating termination as
early as the day after Gaddis suffered her hypoglycemic event at
work, June 5, 2015. On that day, Adoni sent an email to West

-22-

asking "[c]an we make Brenda go to get a physical now and move
her off that way?" It is unclear from the email whether Adoni
was referring to removing Gaddis from the schedule temporarily
until she was medically cleared to return to work or to removing
Gaddis permanently from the schedule. Adoni admitted in her
deposition that she was concerned by that time regarding
Gaddis's rate of errors and the safety of her nursing. This is
not surprising given that Gaddis had been placed on final
written warning for medication administration errors several
weeks earlier, on May 14, 2015. Regardless of Adoni's intent as
of June 5, it is undisputed that Gaddis was medically cleared to
return to work after her hypoglycemic event on June 4 and was
subsequently terminated only after she committed multiple
medication errors while being observed on June 29 by an
independent consultant, IPPC. Thus, Adoni's email or the fact
that Adoni may already have been concerned about Gaddis's
performance as of June 5 is insufficient to raise a genuine
dispute regarding whether the reason for her termination was
pretext for disability discrimination. Instead, the evidence
shows that Adoni did not request permission to terminate Gaddis
until June 29, 2015, after she received the results of the
independent MAO.

      Nor is the fact that Brandywine requested medical
clearances from Gaddis's primary care physician, an

endocrinologist, ophthalmologist, and an occupational health provider before Gaddis could return to work after her hypoglycemic event on June 4, 2015. Under Pennsylvania law, Brandywine must ensure that staff providing care to residents are "free from a medical condition . . . that would limit direct care staff persons from providing necessary personal care services with reasonable skill and safety." 55 Pa. Code § 2600.54; see also id. § 2600.53.

Furthermore, the ADA authorizes employers to send employees for medical examinations that are "job-related and consistent with business necessity" and permits employers "to make inquiries into the ability of an employee to perform job-related functions." 42 U.S.C. §§ 12112(d)(4)(A) & (B). There can be no dispute that Gaddis's hypoglycemic event was a serious incident during which Gaddis lost consciousness for at least fifteen minutes while at work. As a result, she posed a risk of harm both to herself and to Brandywine's residents. Afterwards, Brandywine was justified to require medical clearances before allowing Gaddis to continue to provide medical care to its residents. Brandywine requested clearances from an endocrinologist, an ophthalmologist, and her primary healthcare provider based on the recommendation of the emergency room physician who treated Gaddis after the event that she consult those specialties. There is simply no genuine dispute of

material fact that Brandywine's request for clearances was legitimate and not evidence of discrimination on the basis of disability.

We conclude that Gaddis has not created a genuine dispute of material fact as to whether the reason proffered by Brandywine for her termination is merely pretext for disability discrimination. There is simply no evidence that Gaddis's disability was a "motivating or determinative cause" of her termination. See Fuentes, 32 F.3d at 764. The motion of Brandywine for summary judgment on Gaddis's claims of disability discrimination in her termination will be granted.

V

Gaddis also asserts that Brandywine failed to accommodate her and to engage in the interactive process as required under the ADA and the PHRA.[8] Under the ADA, an employer commits unlawful discrimination on the basis of disability by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a

---

8. Although Gaddis did not explicitly mention failure to accommodate in her EEOC charge, the parties addressed the issue in other papers submitted before the EEOC, and Brandywine would not be prejudiced by consideration of the claim here. We conclude that Gaddis sufficiently exhausted her administrative remedies and thus her failure-to-accommodate claim is properly before this court. See Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398 (3d Cir. 1976); Hicks v. ABT Assocs., Inc., 572 F.2d 960, 966-67 (3d Cir. 1978).

disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."[9] 42 U.S.C. § 12112(b)(5)(A). A reasonable accommodation is defined as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii).

The statutory text of the ADA itself does not refer to the "interactive process." See Shapiro v. Twp. of Lakewood, 292 F.3d 356, 359 (3d Cir. 2002). However, applicable regulations provide:

> To determine the appropriate reasonable
> accommodation it may be necessary for the
> covered entity to initiate an informal,
> interactive process with the individual with
> a disability in need of the accommodation.
> This process should identify the precise
> limitations resulting from the disability
> and potential reasonable accommodations that
> could overcome those limitations.

29 C.F.R. § 1630.2(o)(3). Failure to participate in the interactive process is not an independent claim but rather part

9. Although its statutory text differs, the PHRA has similarly been interpreted to require an employer to provide reasonable accommodations to disabled employees. Our analysis of Gaddis's ADA claim applies equally to her PHRA claim. See Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999).

of a failure to accommodate claim. Whelan v. Teledyne
Metalworking Prods., 226 F. App'x 141, 147 (3d Cir. 2007).

To prevail on a failure to accommodate claim, a
plaintiff must prove:  (1) the employer had knowledge of the
employee's disability; (2) the employee requested accommodations
or assistance for her disability; (3) the employer did not make
a good faith effort to assist the employee in seeking such
accommodations or assistance; and (4) the employee could have
been reasonably accommodated but for the employer's lack of good
faith. Capps v. Mondelez Glob., LLC, 847 F.3d 144, 157 (3d Cir.
2017); Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 319-20
(3d Cir. 1999).

"The law does not require any formal mechanism or
'magic words' to notify an employer . . . that an employee needs
an accommodation." Conneen v. MBNA Am. Bank, N.A., 334 F.3d
318, 332 (3d Cir. 2003) (quoting Taylor, 184 F.3d at 313).
However, the employee "must make clear that . . . [she] wants
assistance for [her] disability." Id. (quoting Jones v. United
Parcel Serv., 214 F.3d 402, 408 (3d Cir. 2000)).  This is so
because "neither the law nor common sense can demand
clairvoyance of an employer." Id. at 331.  Thus, to trigger the
duty to engage in the interactive process, "the employer must
know of both the disability and the employee's desire for
accommodations for that disability." Taylor, 184 F.3d at 313.

Gaddis's claim for failure to make a reasonable accommodation and to engage in the interactive process fails because she never requested any accommodations or assistance from Brandywine. After her hypoglycemic incident while on duty on June 4, 2015, Gaddis was cleared by four healthcare providers to return to work without any restrictions or accommodations. There is no evidence in the record that Gaddis ever requested any accommodation or assistance from Brandywine either before or after that time. While Gaddis has asserted that she was "dissuaded" from taking lunch breaks, she has not offered any evidence to support that assertion such as even a single instance where she was instructed to delay or to forgo her lunch break. Instead, the record indicates that Wellness Nurses were permitted to take their breaks at their discretion unless there was a patient emergency, in which case they may be required to postpone their break until the emergency was resolved. Moreover, snacks were always available both on the medication cart and in the breakroom at Brandywine.

Gaddis's medication errors do not support her claim that Brandywine failed to offer reasonable accommodations or to engage in the interactive process. While she speculates that her diabetes could have increased the risk that she committed such errors, she has not introduced evidence that any particular error actually occurred during a hypoglycemic event or was

otherwise related to her diabetes. "An employee must say or do something to put her employer on notice that she would like to be accommodated at work." Arana v. Temple Univ. Health Sys., No. 18-2124, 2019 WL 2375181, at *3 (3d Cir. June 5, 2019) (citing Conneen, 334 F.3d at 332). Brandywine's knowledge of Gaddis's performance issues did not trigger any duty to provide reasonable accommodations or to engage in the interactive process.

Accordingly, the motion of Brandywine will be granted as to Gaddis's claim for failure to accommodate or to engage in the interactive process under the ADA and the PHRA.